UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

DAVID HENRY OOMEN,

                     Plaintiff,

              -against-

NANCY A. BERRYHILL,[1] Acting
Commissioner, Social Security
Administration,

                 Defendant.

-------------------------------------------------------------X

**OPINION AND ORDER**

16-CV-3556 (JLC)

**JAMES L. COTT, United States Magistrate Judge.**

      Plaintiff David Oomen brings this action seeking judicial review of a final determination by defendant Nancy A. Berryhill, Acting Commissioner of Social Security ("Commissioner"), denying Oomen's application for disability insurance benefits ("DIB"). For the reasons set forth below, the case is remanded to the Commissioner for further proceedings.

## I.    BACKGROUND

### A.    Procedural History

      Oomen initially applied for DIB on March 16, 2010, alleging a disability onset date of May 2, 2007, which was later amended to February 1, 2009. Administrative Record, Dkt. No. 12 ("AR"), at 136, 137. After his application was denied, he filed a request for a hearing. *Id.* at 136. A hearing was held on June 13, 2011, before

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Berryhill is hereby substituted for former Acting Commissioner Carolyn W. Colvin as the defendant in this action.

administrative law judge ("ALJ") Dennis G. Katz. *Id.* ALJ Katz issued a decision dated July 11, 2011, concluding that Oomen was not disabled. *Id.* at 144. On October 28, 2011, the Appeals Council denied Oomen's request for review, rendering ALJ Katz's decision the Commissioner's final determination with respect to Oomen's initial application for DIB. *Id.* at 149. Oomen did not seek judicial review of that determination.

Oomen filed another application for DIB on December 13, 2011, alleging a disability onset date of October 29, 2011, which was later amended to July 12, 2011, continuing through December 31, 2012, the date of last insured. *Id.* at 80–81, 165, 170, 421.[4] After his claim was denied, Oomen requested an administrative hearing. AR at 165, 198. A hearing was held on December 14, 2012. *Id.* at 79. The presiding ALJ, Michael A. Rodriguez (whom the Court refers to simply as the "ALJ"), concluded that Oomen was not disabled in a decision dated March 6, 2013. *Id.* at 170.

Oomen appealed to the Appeals Council and, in an order dated April 25, 2014, the Appeals Council vacated the ALJ's decision and remanded Oomen's case for a new hearing. *Id.* at 176–78. Oomen was represented by counsel at the

---

[4] "In order to retain eligibility for benefits, Social Security Disability claimants must earn at least a minimum threshold amount of Social Security wages within a set period preceding their claim." *Adamik v. Comm'r of Soc. Sec.*, No. 12-CV-3593 (KBF), 2013 WL 3984990, at *1 n.1 (S.D.N.Y. July 31, 2013) (citations omitted). The "date of last insured" is the last day on which a claimant is "last eligible for disability insurance benefits." *Id.* A claimant "is not eligible to receive benefits for any disability beginning after that date." *Id.* (citing 20 C.F.R. §§ 404.130, 404.315; *Arnone v. Bowen*, 882 F.2d 34, 38 (2d Cir. 1989)).

hearing. *Id.* at 13. The new hearing was held on September 4, 2014, before the same ALJ. *Id.* at 13, 26. In a decision dated January 9, 2015, the ALJ found that Oomen was not disabled through December 31, 2012 (the date of last insured). *Id.* at 20. Oomen appealed again to the Appeals Council, which denied his appeal on March 18, 2016, making the ALJ's decision the Commissioner's final determination with respect to Oomen's second application for DIB benefits. *Id.* at 1–4.

On May 12, 2016, Oomen timely commenced this action pursuant to 42 U.S.C. §405(g), seeking judicial review of that decision. *See* Complaint, dated May 12, 2016, Dkt. No. 1. On September 23, 2016, Oomen moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. *See* Memorandum of Law, dated Sept. 23, 2016, Dkt. No 14 ("Pl.'s Mem."). The Commissioner cross-moved for judgement on the pleadings through papers dated November 17, 2016. *See* Memorandum of Law, filed Nov. 17, 2016, Dkt. No. 17 ("Def.'s Mem."). Oomen then replied on December 8, 2016. *See* Plaintiff's Reply Memorandum of Law, dated Dec. 8, 2016, Dkt. 18 ("Pl.'s Reply").

## B. The Administrative Record

### 1. Oomen's Background

Oomen, who was born in 1956, lives with his wife, her sister (whom Oomen described as being mentally "handicapped"), and his two children (who, at the time of the most recent ALJ hearing, were ages 15 and 18). *Id.* at 43, 85–87, 161. Oomen completed two years of college and earned an associate's degree in electrical engineering. *Id.* at 88. From 1992 to 2002, Oomen worked as a fuel coordinator for

3

an electric utility. *Id.* at 58–59, 327, 387.[5] Then, from July 2003 to August 2006, Oomen was a plant manager at a waste water treatment plant. *Id.* at 50, 327, 387. Lastly, Oomen was employed as a plant manager at a Dunkin' Donuts central production facility from November 2006 until May 2007, when he was laid off and began collecting unemployment benefits. *Id.* at 50, 93–94, 327, 387.

According to Oomen, he began experiencing pain (in his back) in 2007, while working at the Dunkin' Donuts facility. *Id.* at 45–46. He attributed the pain, at least in part, to a stroke that he had suffered the previous year. *Id.* at 44–45, 95. According to Oomen, he searched for employment for approximately two years after losing the Dunkin' Donuts position, and only stopped looking in 2009, when his pain became less tolerable. *Id.* at 45. Since 2009, Oomen has had monthly appointments with his treating physician, Dr. Jonathan Rudnick, at Crystal Run Healthcare, where Oomen is treated for, among other things, back, shoulder, knee, and hip pain. *Id.* at 47–48, 434, 772.

In a questionnaire completed in February 2012, Oomen reported that he could dress himself but must "be careful" because he is "unsteady." *Id.* at 338. He also indicated that he could bathe himself but that he, again, must "be careful" and cannot "stand for long" in the shower. *Id.* at 338. He further represented that he had no trouble caring for his hair, feeding himself, or using the toilet. *Id.* at 338–39.

---

[5] Although Oomen's résumé states that he had two different job titles during this period (namely, "Fuel Coordinator" and "Fuels and Marketing Analyst"), Oomen testified that he worked as a fuel coordinator the whole time (without any marketing responsibilities), explaining that his official title had simply changed when new ownership took over his company. AR at 68–69, 387.

4

Additionally, it appears that he regularly prepares simple meals for himself such as a "sandwich" or "can of soup," while his wife otherwise prepares meals for him. *Id.* at 339–40. According to the questionnaire, Oomen can do "very light cleaning" and "dishes" while expressing that it is sometimes difficult to stand. *Id.* at 340. Finally, Oomen reported that he could "only drive short distances" and that he only leaves the house for medical appointments. *Id.* at 342.

## 2. Medical Evidence in the Record

In addition to treating notes from Crystal Run Healthcare, the administrative record contains evaluations of Oomen from three sources: Dr. Rudnick, Oomen's treating physician (*id.* at 433–41, 772–75); Matthew Manzi, a physical therapist (*id.* at 442–43); and Dr. Richard Goccia, a consultative internist (*id.* at 730–41). The record also includes post-operative notes from Dr. Howard Yeon, who performed a spinal-fusion surgery on Oomen in 2013. *Id.* at 743–67.

### a. 2011 Assessment by Treating Physician Dr. Rudnick

Dr. Rudnick is Oomen's treating physician, whom he has seen approximately every month since 2009. *Id.* at 47, 772. In a 2011 report, Dr. Rudnick noted that Oomen had undergone a failed back surgery and that he suffered from arthritis and radiculopathy. *Id.* at 434. Oomen also experienced "chronic" "daily" hip, knee, back, and shoulder pain. *Id.* at 435, 436. According to Dr. Rudnick, Oomen's prognosis was "[g]uarded." *Id.* at 434. Oomen's "primary" symptoms were "[g]eneralized pain" and "numbness [in the] lower extremities." *Id.* at 435. With respect to the "precipitating factors leading to the pain," Dr. Rudnick listed

5

"activities" and "overuse." *Id.* at 436. Dr. Rudnick estimated that Oomen's range of pain was between three and eight on a 10-point scale. *Id.* Regarding whether he had been able to "completely relieve the pain with medication without unacceptable side effects," Dr. Rudnick checked "No" but noted that he had "reduced" Oomen's level of pain. *Id.*

With respect to questions about Oomen's "residual functional capacity" ("RFC") in a "competitive five day a week work environment," Dr. Rudnick responded that, in "an eight-hour day," Oomen could sit for five to six hours and "Stand/Walk" for one to two hours. *Id.* (emphasis omitted). He also stated that Oomen should not sit continuously, noting that he required hourly 10-minute breaks. *Id.* at 436–37. As to whether Oomen's "condition interfere[d] with [his] ability to keep [his] neck in a constant position (e.g. looking at a computer screen, looking down at a desk)," Dr. Rudnick again remarked that Oomen required hourly breaks and opined that Oomen could not perform a job that required him to keep his neck in a constant position. *Id.* at 438–39. Dr. Rudnick indicated that Oomen could "frequently" lift "0–5 lbs."; "occasionally" lift "10–20 lbs."; and "occasionally" carry between "5–10 lbs." *Id.* at 437. He observed that Oomen had no "significant limitations in doing repetitive reaching, handling, fingering or lifting." *Id.* Dr. Rudnick further indicated that Oomen's "impairments" were "[un]likely to produce 'good days' and 'bad days,'" but also stated that Oomen would be "absent from work as a result of the impairments . . . [a]bout two to three times a month." *Id.* at 440. Regarding whether there were "other limitations that would affect [Oomen's] ability

6

to work at a regular job on a sustained basis," Dr. Rudnick indicated that Oomen could not kneel, bend, stoop, or stand. *Id.*

### b.   2011 Assessment by Physical Therapist Manzi

On September 16, 2011, Oomen was examined by physical therapist Manzi. *Id.* at 442. Manzi noted "consistent limitations relating to low back pain, knee pain on right end lower extremity[,] and core strength deficiencies." *Id.* According to Manzi, "[o]bjective signs coincided with [Oomen's] reports of discomfort." *Id.* Manzi observed that Oomen had "some difficulty with balance on uneven ground" and that "strength limitations . . . limited his lifting abilities." *Id.* at 443. In addition, Oomen was "limited to 10-15 minutes with standing tolerance secondary to pain and ha[d] significant lumbar [range of motion] limitations that limit[ed] the speed and quality of his movements." *Id.* Manzi stated that Oomen had "a gait abnormality that is consistent with his diagnosis and that degraded with walking distance." *Id.* Based on his evaluation, Manzi concluded that Oomen met "the demand level of LIGHT according to the U.S. Department of Labor Physical Demand Level except for waist-to-crown and right hand carry, which he met the demand level of SEDENTARY." *Id.*

### c.   2013 Treatment by Orthopedic Surgeon Dr. Yeon

On August 7, 2013, Dr. Yeon performed a spinal-fusion surgery on Oomen. *Id.* at 762.[8] As reported in Dr. Yeon's treatment notes, Oomen underwent this

---

[8] The surgery occurred after Oomen's initial hearing before the ALJ (December 14, 2012) and after date of last insured (December 31, 2012), but before Oomen's second ALJ hearing (September 4, 2014).

7

surgery due to increased pain and numbness in his back and legs, which had been "intermittently disabling" to him. *Id.* at 747. Post-operative notes show improvement in Oomen's "lumbar spine pain" and "leg pain," but also record continued back pain. *Id.* at 756, 759.

### d.    2014 Assessment by Treating Physician Dr. Rudnick

Oomen's treating physician, Dr. Rudnick, completed another evaluation of Oomen dated August 7, 2014. *Id.* at 772–75. In this report, Dr. Rudnick diagnosed Oomen with spinal stenosis and chronic back, neck, knee, and hip pain, placing his pain at a level of six on a 10-point scale. *Id.* at 772. He reported that Oomen could sit for more than three hours with hourly breaks, and stand for two hours with breaks every 15 minutes. *Id.* at 772–73. He also opined that Oomen could sit, stand, or walk for only about two hours in an eight-hour workday with normal breaks. *Id.* at 773. Additionally, Dr. Rudnick noted that Oomen would require "unscheduled breaks" during the workday due to: "Muscle Weakness," "Chronic Fatigue," "Adverse effects of medication," and "Pain / Paresthesias, Numbness." *Id.* According to Dr. Rudnick, Oomen could frequently lift and carry 10 pounds; rarely twist or stoop (bend); and occasionally crouch, squat, and climb stairs and ladders. *Id.* at 774. Finally, Dr. Rudnick indicated that Oomen's condition would produce good and bad days, causing him to miss work more than four days per month. *Id.* at 775.

8

### e.  2014 Assessment by Consultative Internist Dr. Goccia

On June 10, 2014, Dr. Goccia performed a consultative examination of Oomen. *Id.* at 730–34. Dr. Goccia reported that Oomen's gait and stance were "normal," that his squat was "full," and that he could "walk on heels and toes without difficulty." *Id.* at 732. As for his diagnosis of Oomen, Dr. Goccia listed lower back pain, bilateral hip discomfort, sleep apnea, and hypertension. *Id.* at 733. Dr. Goccia stated that Oomen's prognosis was fair and that he was "without limitations." *Id.* Indeed, Dr. Goccia opined that Oomen could continuously lift and carry between 21 and 50 lbs.; frequently lift and carry between 51 to 100 lbs.; and sit, stand, and walk for eight hours without interruption. *Id.* at 735–36. Further, Dr. Goccia stated that Oomen would have no problems: balancing, stooping, kneeling, crouching, crawling, or climbing stairs, ramps, ladders, and scaffolds. *Id.* at 738.

### 3.  ALJ Hearing

#### a.  Oomen Testimony

After the Appeals Council remanded his case, Oomen appeared before the ALJ for a second time on September 4, 2014. *Id.* at 28. Oomen testified about his employment history and prior roles as a fuel coordinator and plant manager. *Id.* at 32–35. He also described his efforts to find work after losing his Dunkin' Donuts position before filing for disability benefits. *Id.* at 35–36. When describing his job search, Oomen explained that his prior positions, even when he had managerial roles, were hands-on and physically demanding, and he believed that he no longer

could perform such work. *Id.* at 35–37. Oomen also stated that he did not think that he could work at a desk job given his inability to sit for extended periods. *Id.* at 37.

Oomen testified that he took OxyContin daily to manage his pain, and that the medication made him "loopy." *Id.* at 37–38. He claimed that four or five days per month he would spend 12 to 15 hours in bed trying to get enough rest "because the pain [would] wake[] [him] up through the night." *Id.* at 39–40, 42. In addition, Oomen testified that he had lost 10 pounds because using the stairs to get to the kitchen was so painful. *Id.* at 40.

Regarding his spinal-fusion surgery in 2013, Oomen stated that it had alleviated his most severe symptoms, but that he still experienced pain and that the surgery had made him less flexible. *Id.* at 41. According to Oomen, bending down became so difficult that his wife began changing his socks. *Id.*

Finally, Oomen described Dr. Rudnick as his "pain specialist," stating that he sees him "monthly." *Id.* at 53. According to Oomen, Dr. Rudnick interacts personally with him on a regular basis, and Oomen believes that he is as familiar with his physical abilities "as any doctor." *Id.* at 53–54.

### b. Vocational Expert

During the hearing Connie Standhart, a vocational expert, testified as to whether Oomen could perform his prior positions based on hypothetical RFCs presented by the ALJ and Oomen's attorney. *Id.* at 64–72. With respect to the RFC that the ALJ would ultimately attribute to Oomen in his decision, Standhart

10

testified that a hypothetical claimant could perform Oomen's past work. *Id.* at 64–66.[9] However, if this RFC were modified to require either hourly 10-minute breaks or two unanticipated absences per month, in addition to the other specified limitations, a claimant could no longer perform Oomen's past work. *Id.* at 71. Further, Standhart testified that no jobs would be available at all for a claimant with this modified RFC who shared Oomen's age, education, and experience. *Id.* at 71–72.

## II. DISCUSSION

### A. Standard of Review

#### 1. Judicial Review of Commissioner's Determination

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson*

---

[9] As discussed below, the ALJ ultimately concluded that Oomen's RFC permitted him to "sit up to six hours per day, stand and walk up to two hours per day; occasionally lift and carry 10 pounds; frequently lift and carry up to five pounds; never push and pull with the lower extremities; never climb ropes, ladders, or scaffolds; occasionally climb ramps and stairs; occasionally balance and stoop; and never kneel, crouch, or crawl. [Oomen] also must avoid workplace hazards such as unprotected heights." AR at 16; *infra* at 19.

*v. Perales.* 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Id.* (quoting *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir. 1983)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g). Remand is "particularly appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, 'further findings would . . . plainly help to assure the proper disposition of [a] claim.'" *Kirkland v. Astrue,* No. 06-CV-4861 (ARR), 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008) (quoting *Butts,* 388 F.3d at 386) (alterations in original).

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.,* 683 F.3d 443, 448 (2d Cir. 2012). The reviewing court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue,* 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault,* 683 F.3d at

448 (quoting *Warren v. Shalaa,* 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

## 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing whether a claimant's impairments meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition." *Mongeur,* 722 F.2d at 1037. Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citations omitted).

### a. Five-Step Inquiry

The Commissioner's determination of disability follows a sequential, five-step inquiry. *Cichocki v. Astrue,* 729 F.3d 172, 173 n.1 (2d Cir. 2013). First, the

Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is unemployed, at the second step the Commissioner determines whether the claimant has a "severe" impairment restricting his ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix 1 of Subpart P of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is considered disabled. *Id.*; 20 C.F.R. § 404.1520(d). If not, the Commissioner continues to the fourth step and determines whether the claimant has the RFC to perform his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant can do any other work. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps. *Burgess v. Astrue,* 537 F.3d 117, 128 (2d Cir. 2008). The burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy. *See Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir. 2009).

### b. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel,* 530 U.S. 103, 110–11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop

the record." *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted). As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims,* 530 U.S. at 111. Specifically, under the applicable regulations, the ALJ is required to "develop a complete medical record before making a disability determination." *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. § 404.1512(d)–(f)).

Whether the ALJ has satisfied this duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue,* No. 09-CV-3999 (KAM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart,* No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law."). The ALJ must develop the record even where the claimant has legal counsel. *See, e.g., Perez,* 77 F.3d at 47. Remand is appropriate where this duty is not discharged. *See, e.g., Moran,* 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c. Treating Physician Rule

"'Regardless of its source,' the ALJ must 'evaluate every medical opinion' in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue,* No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (quoting 20 C.F.R. §§ 404.1527(c), 416.927(c)). A treating physician's opinion receives controlling weight, provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). "The regulations define a treating physician as the claimant's 'own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant].'" *Henny v. Comm'r of Soc. Sec.,* No. 15-CV-0629 (RA), 2017 WL 1040486, at *9 (S.D.N.Y. Mar. 15, 2017) (quoting 20 C.F.R. § 404.1502). Deference to such a medical provider is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2).

A treating physician's opinion is not always controlling. For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner. *Guzman v. Astrue,* No.

09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011); *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."). Additionally, where "'the treating physician issue[s] opinions that [are] not consistent with other substantial evidence in the record, such as the opinion of other medical experts,' the treating physician's opinion 'is not afforded controlling weight.'" *Pena ex rel. E.R.,* 2013 WL 1210932, at *15 (quoting *Halloran,* 362 F.3d at 32); *see also Snell,* 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

To determine how much weight a treating physician's opinion deserves, the ALJ must consider several factors outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran,* 362 F.3d at 32; *see* 20 C.F.R. § 404.1527(c). If, based on these considerations, the ALJ declines to give controlling weight to the treating physician's opinion, the ALJ must nonetheless "comprehensively set forth reasons for the weight" ultimately assigned to the treating source. *Halloran,* 362 F.3d at 33; *accord Snell,* 177 F.3d at 134 (responsibility of determining "the ultimate issue of disability" does not "exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited") (citations

17

omitted). The regulations require that the Commissioner "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician. *Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted). Indeed, "[c]ourts have not hesitated to remand cases when the Commissioner has not provided 'good reasons.'" *Pena ex rel. E.R.,* 2013 WL 1210932, at *15 (quoting *Halloran,* 362 F.3d at 33) (alterations omitted).

## B.    ALJ's Decision

In a decision dated January 9, 2015, the ALJ concluded that Oomen was not disabled through December 31, 2012, the date of last insured. AR at 20. The ALJ reached this decision after following the five-step inquiry. At step one, the ALJ determined that Oomen was not engaged in substantial gainful employment from the alleged onset date of October 29, 2011 through December 31, 2012. *Id.* at 15. At step two, the ALJ found that Oomen had the following severe impairments: degenerative disc disease of the lumbar, cervical, and thoracic spine; osteoarthritis; high blood pressure; kidney stones; degenerative joint disease of the right knee and hips bilaterally. *Id.* At step three, the ALJ concluded that none of these impairments or combination of impairments met or medically equaled the severity of a listed impairment. *Id.* at 15–16. The parties do not challenge the ALJ's findings with respect to the first three steps.

18

At step four, the ALJ determined that Oomen "had the residual functional capacity [RFC] to perform light work as defined in 20 CFR 404.1567(b)." *Id.* at 16.[10]

Specifically, the ALJ found that Oomen could

> sit up to six hours per day, stand and walk up to two hours per day; occasionally lift and carry 10 pounds; frequently lift and carry up to five pounds; never push and pull with the lower extremities; never climb ropes, ladders, or scaffolds; occasionally climb ramps and stairs; occasionally balance and stoop; and never kneel, crouch, or crawl. [Oomen] also must avoid workplace hazards such as unprotected heights.

AR at 16.

In his evaluation of Oomen's symptoms, the ALJ noted that Oomen had "allege[d] that a stroke, spinal arthritis; spinal stenosis; right knee impairment; high blood pressure; and kidney stones prevent him from working." *Id.* at 17. He observed that Oomen had testified "that he [was] in bed 12 to 15 hours per day and ha[d] lost 10 pounds recently due to his difficulty getting to the kitchen." *Id.* The ALJ determined that Oomen's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms [were]

---

[10] *See* 20 C.F.R. 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.").

19

not entirely credible." *Id.* Specifically, the ALJ wrote that Oomen's "treatment history indicates consistent complaints but clinical findings and objective medical testing does not support the degree of limitations alleged." *Id.* In making this determination, the ALJ considered Oomen's x-rays, noting that an x-ray in 2011 "found right shoulder osteopenia, disc bulges at L5-S1 and L3-L4, and mild C5-C6 spondylitis" and that an x-ray from January 2012 "found degenerative changes in the hips but no other abnormalities." *Id.*

Regarding the 2011 report of physical therapist Manzi, the ALJ pointed out that Oomen had complained to Manzi about "low back pain," which, according to Manzi, "limited [Oomen's] capacity to lift objects and limited the amount of time he could stand." *Id.* As recounted by the ALJ, Manzi "reported that the claimant displayed good lower extremity coordination and would only be limited with his ability to lift and carry objects." *Id.* Describing Manzi as "the claimant's physical therapist," the ALJ gave "[s]ome weight" to his evaluations "despite the lack of being an acceptable medical source because he has treated the claimant." *Id.*[12]

With respect to the 2011 report of treating physician Dr. Rudnick, the ALJ observed that Dr. Rudnick had diagnosed Oomen with "chronic pain." *Id.* As recounted by the ALJ, Dr. Rudnick had indicated that Oomen could "occasionally

---

[12] As discussed below, there does not appear to be evidence in the record that Manzi treated Oomen. *See infra* at 29 n.13; *see also Cascio v. Astrue*, No. 10-CV-5666 (FB), 2012 WL 123275, at \*3 (E.D.N.Y. Jan. 17, 2012) ("A physical therapist is not an 'acceptable medical source' as defined in the regulations.") (citing 20 C.F.R. § 404.1513).

lift up to 20 pounds and occasionally carry up to 10 pounds"; that he "need[ed] hourly breaks"; and that he was "unable to kneel, bend, or stoop." *Id.* The ALJ also recounted Dr. Rudnick's opinion that "pain and fatigue constantly interfere[d] with [Oomen's] attention and concentration, and [that Oomen] would miss about two to three days of work per month." *Id.*

The ALJ gave "[s]ome weight" to Dr. Rudnick's 2011 assessment "because he is a treating source." *Id.* Yet the ALJ found "no support in the record" for the notion that Oomen "needs hourly breaks or is unable to stoop." *Id.* "In fact," the ALJ stated that "a letter [from Dr. Rudnick] dated February 29, 2012 shows a functional ability far above his medical source statement." *Id.* Further, in the ALJ's view, "Dr. Rudnick's opinion regarding the [Oomen's] missed days of work [was] speculative and not supportive by the functional limitations opined." *Id.*

The ALJ also examined Oomen's treatment notes, which he concluded "confirm[ed]" that Oomen's "conditions remained controlled." *Id.* at 18. For example, in January 2012, despite "reported pain in his neck, back, shoulders, hips, knees, and intermittent pain in his feet," Oomen had "reported [that] he was doing well." *Id.* Tests of Oomen's musculoskeletal system demonstrated "no tenderness and full range of motion for the neck back, shoulders, and hips." *Id.* Treatment records from February 2012 memorialized that Oomen "complained of chronic pain but noted that medication allows him to function." *Id.* Similarly, treatment records from November 2012 "note generalized pain but again reported improvement with medication." *Id.*

Regarding internist Dr. Goccia's 2014 consultative evaluation of Oomen, the ALJ observed that the report indicated that Oomen was "in no acute distress, had normal gait, could walk on heels and toes without difficulty, had full squat and normal stance, and did not need assistance during the examination." *Id.* Dr. Goccia had found "reduced flexion in the lumbar spine but no other" musculoskeletal "abnormalities." *Id.* Although Dr. Goccia had opined that Oomen was "without limitations," the ALJ gave this report "[l]ittle weight" because Oomen "clearly ha[d] some limitations in functioning" and because the report was "inconsistent with the clinical findings made during the examination" and did not "take into account [Oomen's] subjective allegations." *Id.*

Regarding Dr. Rudnick's 2014 evaluation, the ALJ recounted that Dr. Rudnick had opined that Oomen was unable to work based on "chronic pain, medication use, and medical issues." *Id.* Dr. Rudnick stated that Oomen "need[ed] breaks every 15 minutes"; was only "able to sit up to two hours per day; stand and walk up to two hours per day; lift and carry up to 10 pounds; rarely twist and stoop; and occasionally crouch, climb stairs, and climb ladders." *Id.* The ALJ wrote that, according to Dr. Rudnick's 2014 report, Oomen "would be absent from work more than four days per month." *Id.*

The ALJ gave Dr. Rudnick's 2014 evaluation "[n]o weight," as he found it to be "wholly inconsistent with treatment records." *Id.* at 18. The ALJ discredited the evaluation because it stated that Oomen was "unable to work due to pain, surgeries, and medication but the evidence . . . indicate[d] improvement with medication." *Id.*

The ALJ also concluded that Dr. Rudnick's 2014 evaluation was "inconsistent with [Oomen's] reported activities of daily living." *Id.*

The ALJ theorized, without pointing to evidence in the record, that Dr. Rudnick's 2014 report was written out of sympathy for Oomen: "The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another." *Id.* The ALJ further observed that "patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients requests and avoid unnecessary doctor/patient tension." *Id.* The ALJ admitted that there is no evidence of these ulterior motives, but asserted that they "are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case." *Id.*

Finally, regarding Oomen's "daily activities," the ALJ concluded that they were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." *Id.* at 19. For example, Oomen reported to Dr. Goccia that he could "help with cooking, cleaning, and shopping, and . . . perform personal hygiene." *Id.* In addition, the ALJ noted that Oomen had "not generally received the type of medical treatment one would expect for a totally disabled individual," finding that his treatment had been "essentially routine and conservative in nature" and that "medical records reveal that the medications ha[d] been relatively effective in controlling the claimant's symptoms." *Id.*

In sum, the ALJ stated that his RFC assessment was "supported by the totality of the medical evidence." *Id.* After determining that Oomen could perform light work as defined in 20 C.F.R. 404.1567(b), the ALJ concluded that Oomen could perform his past relevant work. *Id.*

## C.  Analysis

Oomen argues that the ALJ's decision should be reversed for four reasons. First, Oomen contends that, on remand, the ALJ failed to comply with the Appeals Council's order. Pl.'s Mem. at 10–12. Second, Oomen argues that the ALJ violated the treating physician rule by failing to provide "good reasons" for not assigning controlling weight to Dr. Rudnick's opinion. *Id.* at 12–14. Third, Oomen claims that the ALJ erred in assessing his credibility and evaluating his subjective complaints. *Id.* at 15–18. Fourth, Oomen asserts that the ALJ's RFC assessment was flawed, as the ALJ cited no medical evidence in support of his assessment and it was not endorsed by any medical professional. *Id.* at 18–19.

The Court rejects the first argument after determining that the ALJ complied with the mandates of the Appeals Council. Concerning the second argument, the Court concludes that the ALJ did in fact violate the treating physician rule by failing to give "good reasons" for not assigning Dr. Rudnick's opinion controlling weight. The Court remands this case on that basis. While it therefore need not reach Oomen's third and fourth arguments, the Court discusses them only to the extent that Oomen's contentions raise potential problems that the ALJ may wish to address on remand.

### 1. ALJ's Compliance with Appeals Council's Order

Oomen first argues that the ALJ failed to comply with the Appeals Council's order that remanded his case for a new hearing. *Id.* at 10. According to the regulations, "[t]he administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 404.977(b). "The failure of an ALJ to abide by the directives in an Appeals Council remand order constitutes legal error requiring remand." *Ellis v. Colvin*, 29 F. Supp. 3d 288, 299 (W.D.N.Y. 2014).

As relevant here, the Appeals Council directed the ALJ, on remand, to give "further consideration" to both Dr. Rudnick's opinion and to the claimant's RFC. AR at 176–77. The Appeals Council took issue with the fact that, in his initial decision, the ALJ had assigned "'great weight'" to Dr. Rudnick's opinion, even though Dr. Rudnick had found "limitations that exceeded" the ALJ's RFC assessment. *Id.* at 176. Accordingly, the Appeals Council directed the ALJ to "provide appropriate rationale with specific references to evidence of record in support of [Oomen's] assessed limitations" and to "explain the weight given" to Dr. Rudnick's opinion. *Id.* at 177.

Oomen appears to argue that the ALJ failed to comply with the Appeals Council order because (1) the RFC assessment in the ALJ's modified decision excludes "very important limitations" identified by Dr. Rudnick, (2) the ALJ went from finding that Oomen could perform only "[s]edentary work" to performing "'light

work,'" and (3) the ALJ went from affording Dr. Rudnick's decision "great weight" to "'some weight.'" Pl.'s Mem at 11–12; *see also* Pl.'s Reply at 1–2. The Appeals Council, however, did not mandate that the ALJ include any particular limitations in his RFC assessment, nor did the Appeals Council provide guidance as to whether Oomen's RFC should allow for light or sedentary work. The Appeals Council also did not direct the ALJ to assign any particular weight to Dr. Rudnick's opinion. Thus, Oomen has not identified any Appeals Council mandate that the ALJ failed to follow. Consequently, the Court will not reverse or remand this case for failure to abide by the Appeals Council order.

### 2. Violation of the Treating Physician Rule

#### a. Dr. Rudnick's 2011 Report

Oomen next argues that the ALJ violated the treating physician rule by failing to give "good reasons" for not assigning controlling weight to Dr. Rudnick's opinion. *See* Pl.'s Mem. at 12. As described above, pursuant to the treating physician rule, controlling weight must be assigned to a treating physician's opinion when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see supra* at 16–18. "If the ALJ does not give controlling weight to a treating physician's opinion, the ALJ must provide 'good reasons' for the weight given to that opinion." *Garcia v. Comm'r of Soc. Sec.*, No. 15-CV-6544 (GWG), 2016 WL 5369612, at *3 (S.D.N.Y. Sept. 23, 2016) (internal citations omitted). "Good reasons" are those which assist in judicial review of cases

as well as allow claimants to better understand the outcome of their cases. *Halloran*, 362 F.3d at 33 ("This requirement greatly assists our review of the Commissioner's decision and lets claimants understand the disposition of their cases.") (internal alterations and quotation marks omitted) (citing *Snell*, 177 F.3d at 134). The Second Circuit "has consistently held that the failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012) (citing *Halloran*, 362 F.3d at 33 and *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)).

Here, the ALJ did not provide "good reasons" for the weight assigned to key components of Dr. Rudnick's opinion. The ALJ afforded "[s]ome weight" to Dr. Rudnick's 2011 evaluation given his status as a treating source. AR at 17. The ALJ concluded, however, that there was "no support in the record" for Dr. Rudnick's opinion that Oomen "needs hourly breaks or is unable to stoop." *Id.* Such a conclusory statement does not constitute a "good reason" for not assigning controlling weight to a treating physician's opinion. *See Mercado v. Colvin*, No. 15-CV-2283 (JCF), 2016 WL 3866587, at *16 (S.D.N.Y. July 13, 2016) (ALJ's "conclusory assertion that 'scant evidence' supported a four-hour workday restriction . . . does not countenance discrediting this limitation") (collecting cases).

The ALJ cites a February 29, 2012 letter from Dr. Rudnick, which, according to the ALJ, indicated "a functional ability far above" the one asserted in the 2011 evaluation. AR at 17. The 2012 letter, however, does not specifically comment on

Oomen's ability to stoop, or on his need (if any) for breaks. *Id.* at 634. To the extent that this letter (which concludes that Oomen "will not be able to work in the future") is inconsistent with Dr. Rudnick's 2011 evaluation, it is not apparent that the ALJ made any effort to resolve the inconsistency by re-contacting Dr. Rudnick for clarification or by taking other appropriate action contemplated by the regulations. *Id.*; *see, e.g.*, *Gagovits v. Colvin*, No. 15-CV-3246 (JS), 2016 WL 4491537, at *9 (E.D.N.Y. Aug. 25, 2016) ("In applying 20 C.F.R. § 404.1520b, courts in this Circuit have held that where additional information is needed regarding the opinion of a treating physician, the ALJ should contact the treating source 'for clarification and additional evidence.'"); *Piscope v. Colvin*, 201 F. Supp. 3d 456, 464 (S.D.N.Y. 2016) ("Given the conflicts in the medical evidence, and in light of the ALJ's decision to grant none of the medical opinions full weight, the record calls for enhancement through inquiries to the treating physicians or consultants that might shed light on the import of their opinions and the conflicts the ALJ identified.").

Regarding Dr. Rudnick's opinion that Oomen would be absent from work approximately two or three days per month, the ALJ deemed Dr. Rudnick's opinion "speculative" and "not support[ed] by the functional limitations opined." AR at 17, 440. Again, such conclusory statements are insufficient grounds for discounting a treating physician's opinion. *See Wilson v. Colvin*, No. 6:15-CV-6377 (MAT), 2016 WL 5661973, at *4 (W.D.N.Y. Oct. 3, 2016) ("The . . . allegedly 'speculative' nature of [treating physician's] professional opinion . . . is not a 'good reason.'"); *Russell v. Comm'r of Soc. Sec.*, No. 5:13-CV-1398, 2015 WL 5602939, at *2–3 (N.D.N.Y. Sept.

22, 2015) ("ALJ's single, short statement that the 'extreme limitations' are inconsistent with the medical record and objective findings, including those of [the treating doctor] himself, contains no explanation of what these contradictions were or why they were so severe that [the treating doctor's] opinion could be ignored.").[13]

The question of whether the ALJ properly rejected Dr. Rudnick's opinions regarding Oomen's need for unanticipated absences and hourly breaks is vital to the resolution of this case, as these limitations are potentially dispositive of whether Oomen is disabled. At the hearing, the ALJ proposed hypothetical RFCs to vocational expert Standhart to assess how those limitations would affect a claimant's ability to work. The ALJ asked her to assume an RFC that included

> sit[ting] for six hours out of an eight hour day; standing,
> walking two out of eight; occasionally lifting 10 pounds,
> five pounds more frequently; no lower extremity
> push/pull; no ropes, ladders, or scaffolds; occasional stairs
> and ramps; occasional kneeling; no crawling . . . Assume
> frequent overhead distance and directional reaching. And
> let's have him avoid working around workplace hazards,
> such as unprotected heights.

---

[13] Whether the ALJ believed that physical therapist Manzi's evaluation in any way discredited Dr. Rudnick's opinion is unclear. The ALJ simply noted that he gave "[s]ome weight" to Manzi's evaluation because he was "[Oomen's] physical therapist" and had "treated" Oomen. AR at 17. As far as the Court can tell, however, there is no evidence that Manzi actually treated Oomen. To the contrary, the record is replete with references to the fact that Oomen was not interested in physical therapy due to cost concerns. *See id.* at 489, 500, 506, 514, 522, 535, 570, 595, 638, 646, 656, 662–63, 670, 676, 681, 687, 689, 694, 702, 723. To the extent that Manzi is not Oomen's treating physical therapist, the ALJ should reassess the weight assigned to his report.

AR at 64–65. The ALJ modified the hypothetical RFC to include "occasional balancing and stooping," but "no kneeling, crouching, or crawling." *Id.* at 65. These two sets of conditions, combined, constitute the RFC finding that the ALJ would later make in his decision. *Id.* at 16; *see supra* at 19. Standhart testified that a hypothetical claimant with such an RFC could perform Oomen's past work, at least as those positions are described by the Dictionary of Occupational Titles. *Id.* at 65–66. But if the claimant were to require hourly breaks, or require two unexpected absences per month, the claimant could no longer perform those roles. *Id.* at 70–72. Further, no jobs at all would exist for a claimant with such an RFC who shared Oomen's age, education, and experience. *Id.* at 71–72.

Consequently, it "'cannot be said that the ALJ's analysis of [the treating physician's] opinions was harmless error because the [vocational expert] essentially testified that if these opinions were adopted, [Oomen] would be unable to work.'" *Pines v. Comm'r of Soc. Sec.*, No. 13-CV-6850 (AJN) (FM), 2015 WL 872105, at *10 (S.D.N.Y. Mar. 2, 2015) (quoting *Archambault v. Colvin*, No. 2:13-CV-292, 2014 WL 4723933, at *10 (D. Vt. Sept. 23, 2014)), *adopted by*, 2015 WL 1381524 (S.D.N.Y. Mar. 25, 2015)). Thus, the Court remands this case to the Commissioner to articulate "good reasons" for rejecting the treating physician's opinion. *Pines*, 2015 WL 1381524, at *3 ("Due to the importance of the treating physician rule, the Second Circuit has made clear that it will 'not hesitate to remand when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion and it will continue remanding when it encounters opinions

from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.'") (alternations omitted) (quoting *Halloran*, 362 F.3d at 33).

In opposition, the Commissioner does not address the treating physician rule by name, much less identify "good reasons" articulated by the ALJ for rejecting Dr. Rudnick's opinion with respect to these limitations. Instead, the Commissioner observes only that the "ALJ acknowledged that Dr. Rudnick was a treating physician" and that "the ALJ's analysis need not follow any particular semantic formula." Def.'s Mem. at 19–20. According to the Commissioner, the ALJ "had more than adequate evidence to reach a decision on Plaintiff's disability claim, and nothing further was required." *Id.* at 20.

However, "'legal error is cause for remand, even if substantial evidence exists to support the Commissioner's factual findings.'" *Jones v. Barnhart*, No. 02-CV-791 (SHS), 2003 WL 941722, at *12 (S.D.N.Y. Mar. 7, 2003) (quoting *Mann v. Chater*, No. 95-CV-2997 (SS), 1997 WL 363592, at *2 (S.D.N.Y. June 30, 1997). Although an ALJ's compliance with the treating physician rule may not compel a particular "semantic formula," "the ALJ must comprehensively set forth his reasons for the weight assigned to a treating physician's opinion" and the "failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (internal quotation marks omitted). Thus, the Commissioner's arguments lack merit.

###### b. Dr. Rudnick's 2014 Evaluation

Dr. Rudnick completed another evaluation of Oomen dated August 7, 2014, in which he opined that Oomen's limitations were, at least in some areas, more restrictive than described in his 2011 report. AR at 772–75.[15] The ALJ assigned "[n]o weight" to this report, finding it to be "wholly inconsistent with treatment records" and "inconsistent with the claimant's reported activities of daily living." *Id.* at 18. The ALJ attributed the opinions expressed in the report to Dr. Rudnick's sympathy for Oomen, noting that some "patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients requests and avoid unnecessary doctor/patient tension." *Id.* The ALJ cites no evidence in support of these conclusions, acknowledging that "it is difficult to confirm the presence of such motives." *Id.*

---

[15] Dr. Rudnick's 2014 evaluation is dated nearly two years after the date of last insured (December 31, 2012). The extent to which this report is retroactive, and the extent to which the ALJ viewed it as retroactive, is not immediately clear from the record. The ALJ should resolve this ambiguity on remand. *See McAllister v. Colvin*, 205 F. Supp. 3d 314, 332 (E.D.N.Y. 2016) ("[A] physician's opinion may potentially be entitled to less weight if the examination occurred after the date last insured and no connection is made between the recent diagnosis and plaintiff's condition during the date last insured. However, even if [the treating physician] did not treat plaintiff during the period prior to plaintiff's date last insured, that fact alone does not show that [the treating physician's] opinion warrants no consideration or weight.") (citations omitted); *Salisbury v. Colvin*, No. 13-CV-2805 (VEC) (MHD), 2015 WL 5458816, at *32 n.130 (S.D.N.Y. Sept. 1, 2015) ("'Where there is ambiguity regarding whether a treating physician's statement bears on the alleged period of disability, the ALJ must seek to resolve this ambiguity.'") (internal quotation marks omitted), *adopted by*, 2015 WL 5566275 (S.D.N.Y. Sept. 21, 2015).

On remand, the ALJ should avoid speculation about Dr. Rudnick's motives. *See Wade v. Colvin*, No. 3:15-CV-47 (DJS), 2016 WL 1170917, at *8 (D. Conn. Mar. 24, 2016) (finding "reasons stated by the ALJ for not crediting the opinions of" treating physician "speculative" where the ALJ, using the same phrasing as the ALJ here, had stated "that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes" and that some "patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension"); *see also Gramley v. Comm'r of Soc. Sec.*, No. 8:15-CV-1041, 2016 WL 4975333, at *5 (M.D. Fla. Sept. 19, 2016) ("In regard to the ALJ's musings about an inherent possibility for sympathy bias in the doctor-patient relationship, that notion is sheer speculation and is contrary to well-established law requiring that a treating physician's opinion be given substantial weight absent clearly articulated good cause for a contrary finding.") (internal quotation marks omitted); *Goyco v. Colvin*, No. 13-CV-6328, 2014 WL 5152570, at *5 (N.D. Ill. Oct. 14, 2014) ("'[A]n ALJ's mere conjecture of a sympathetic response is not an acceptable basis for ignoring the treating physician's views.'") (quoting *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009)).

To the extent that Dr. Rudnick's 2014 report is "wholly inconsistent with treatment records" and "inconsistent with the claimant's reported activities of daily living," the ALJ fails to cite any evidence to support these conclusory statements.

AR at 18. On remand, the ALJ should offer good reasons before rejecting Dr. Rudnick's opinions consistent with the discussion in subsection (a) above.

### c. Consideration of 20 C.F.R. § 404.1527(c) Factors

Although remand may not be warranted on this basis alone, it is not clear from the record that the ALJ considered all of the factors that should be assessed before declining to give a treating physician's opinion controlling weight. 20 C.F.R. § 404.1527(c); *Halloran*, 362 F.3d at 32. The ALJ need not discuss each factor expressly, but it should be clear from his decision that he considered each of them. *Camacho v. Colvin*, No. 15-CV-7080 (CM) (DF), 2017 WL 770613, at *22 (S.D.N.Y. Feb. 27, 2017) ("when an ALJ decides to give less than controlling weight to the opinion of a treating source, the ALJ's consideration of each of those factors must be transparent") (internal quotation marks omitted). The only factors that the ALJ discussed—the evidence (or lack of evidence) supporting the treating physician's opinion and the consistency of the opinion with the record as a whole—were addressed in a conclusory fashion. The other factors—concerning the specialization of the doctor and the length, nature, and extent of the treatment relationship with the claimant—went unmentioned in the ALJ's decision. Here, for example, it is noteworthy that Dr. Rudnick treated Oomen on a monthly basis since 2009, thus lending his familiarity with Oomen particular credence. On remand, the ALJ should address the factors set out in 20 C.F.R. § 404.1527(c) more thoroughly.

34

### 3.    Other Arguments

Because the Court concludes that the ALJ did not follow the treating physician rule and remands on that basis, the Court need not reach Oomen's other arguments. The Court will, however, discuss plaintiff's remaining contentions to the extent that they present potential issues that the ALJ may wish to address on remand. *See, e.g.*, *Molina v. Colvin*, No. 15-CV-8088 (JLC), 2016 WL 7388374, at *5 (S.D.N.Y. Dec. 20, 2016).

### a.    Assessment of Oomen's Credibility and Subjective Complaints of Pain

Oomen argues that the ALJ failed to properly assess his credibility and evaluate his subjective complaints of pain. *See* Pl.'s Mem. at 15. In evaluating a claimant's credibility, an ALJ must perform a two-step analysis. "The ALJ must first decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Torregrosa v. Colvin*, No. 15-CV-2257 (RRM), 2017 WL 1048068, at *8 (E.D.N.Y. Mar. 17, 2017) (internal quotation marks and citation omitted) (citing C.F.R. § 404.1529(a)–(b)). "Assuming the ALJ finds such an impairment, then the ALJ must take the second step of evaluating the intensity and persistence of the claimant's symptoms." *Paz v. Comm'r of Soc. Sec.*, No. 15-CV-6353 (AJN) (DF), 2017 WL 1082684, at *24 (S.D.N.Y. Feb. 1, 2017), *adopted by*, 2017 WL 1078573 (S.D.N.Y. Mar. 20, 2017). "In doing so, the ALJ must consider all of the available evidence, and must not 'reject statements about the intensity and persistence of pain and other symptoms 'solely because the available objective medical evidence does not substantiate the

claimant's statements.'" *Id.* (quoting *Cichocki v. Astrue*, 534 F. App'x. 71, 76 (2d Cir. 2013)) (citing 20 C.F.R. § 416.929(c)(1)). "Instead, where the claimant's contentions regarding his or her symptoms are not substantiated by the objective medical evidence, the ALJ must consider the other evidence and make a finding as to the claimant's credibility, in order to determine the extent to which the claimant's symptoms affect his or her ability to do basic work activities." *Id.* In doing so, the ALJ should consider the factors set forth in 20 C.F.R. § 416.929(c)(3).[16]

"'It is the function of the [Commissioner], not the [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.'" *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) (quoting *Aponte v. Sec'y, Dep't of Health & Human Servs.,* 728 F.2d 588, 591 (2d Cir. 1984)) (alterations in original). However, the "ALJ's decision 'must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight.'" *Cichocki*, 534 F. App'x at 76 (quoting SSR 96–7p, 1996 WL 374186, at *2). As long as the ALJ provides a sufficiently specific

---

[16] These factors include: "(i) [The claimant's] daily activities; (ii) The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [his] pain or other symptoms; (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of [his] pain or other symptoms; (vi) Any measures . . . to relieve . . . pain or other symptoms . . . ; and (vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 416.929(c)(3).

rationale for qualifying the claimant's statements, the decision is "generally entitled to deference on appeal." *Selian*, 708 F.3d at 420; *see also Wicks v. Colvin*, No. 5:15-CV-937 (LEK) (ATB), 2016 WL 6110503, at *8 (N.D.N.Y. Oct. 19, 2016) ("An ALJ may properly reject subjective complaints after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.") (internal alterations and quotation marks omitted), *adopted by*, 2016 WL 6106471 (N.D.N.Y. Oct. 19, 2016).

Here, the ALJ found that Oomen's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." AR at 17. The ALJ appears to believe that Oomen's x-ray reports undermine the severity of his alleged symptoms, noting, for example, that a "January 2012 . . . x-ray found degenerative changes in the hips but no other abnormalities." *Id.* Yet the ALJ does not state what is missing from the x-ray or explain how it makes Oomen's subjective complaints not credible. Moreover, the ALJ does not address MRI results, also from January 2012, which at least appear to contain evidence of complications beyond those noted in the x-ray. *Id.* at 462, 546, 548.

The ALJ indicated that Oomen's daily activities were "not limited to the extent one would expect given the complaints of disabling symptoms and

limitations." *Id.* at 19. The ALJ specifically refers to the fact that Oomen "reported to the consultative internist that he is able to help with the cooking, cleaning, and shopping, and is able to perform personal hygiene." *Id.* at 19, 731. Yet Oomen has also reported that he has had difficulty with daily activities, stating, for example, that he takes quick showers to avoid standing for long and that his meal preparation consists of soups and sandwiches. *Id.* at 338–39. It is unclear whether the ALJ accounted for Oomen's alleged difficulties in performing his daily activities. Further, the ALJ does not specify which of Oomen's alleged limitations are contradicted by his daily activities. *See Pena v. Astrue,* No. 07-CV-11099 (GWG), 2008 WL 5111317, at *12 (S.D.N.Y. Dec. 3, 2008) ("The ALJ's decision needs to explain what portions of [plaintiff's] testimony are being rejected and for what reason.").

The ALJ appears to cite Oomen's treatment history as a reason for discounting his alleged symptoms, observing that the "claimant has not generally received the type of medical treatment one would expect for a totally disabled individual." AR at 19. Yet the type of treatment that is missing from Oomen's medical history is left unsaid, and it is unclear if the ALJ took into account Oomen's past surgeries when making this statement. *Id.* at 140, 496, 747–50. Further, the ALJ does not cite the opinion of any medical professional for the notion that Oomen's medical treatment fell below the level of a truly disabled person. *Id.* at 19; Pl.'s Mem. at 17. For these reasons, the ALJ should more thoroughly evaluate Oomen's subjective complaints of pain on remand.

### b.    RFC Assessment

Finally, Oomen contends that the ALJ's RFC assessment is flawed because the ALJ offers "no citation . . . to medical evidence in support of his RFC determination." Pl.'s Mem. at 18. Oomen claims that "'an ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings.'" *Id.* (quoting *Dailey v. Astrue*, No. 09-CV-99 (AM), 2010 WL 4703599, at *11 (W.D.N.Y. Oct. 26, 2010), *adopted by*, 2010 WL 4703591 (W.D.N.Y. Nov. 19, 2010)). Oomen further argues that "'[w]here the medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate those diagnoses to specific residual functional capabilities,' the Commissioner generally 'may not make the connection himself.'" *Id.* at 19 (quoting *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008)).

The ALJ should determine on remand whether his RFC assessment would benefit from additional medical opinions. Although no medical experts have wholly endorsed the ALJ's RFC determination, "the determination of the [RFC] is an issue reserved for the Commissioner." *Lacy v. Astrue*, No. 11-CV-4600 (MKB), 2013 WL 1092145, at *16 (E.D.N.Y. Mar. 15, 2013) (internal quotation marks omitted). In the cases cited by Oomen, the courts remanded not because the ALJs disagreed with medical professionals' RFC assessments, but because such assessments were absent. *See Dailey*, 2010 WL 4703599, at *10 ("there does not appear to be any medical assessment in the record of the limitations associated solely with plaintiff's depression and post traumatic stress disorder absent any underlying drug, alcohol

and methadone use"); *Deskin*, 605 F. Supp. 2d at 910 (remanding due to "absence from the administrative record of a proper medical opinion as to [plaintiff's] work-related limitations"). Here, medical professionals have offered opinions as to Oomen's RFC; the ALJ simply disagrees with them to one degree or another. Consequently, the cases relied on by Oomen are distinguishable. That said, the ALJ may decide to solicit additional medical opinions on remand to the extent that he believes they would be useful given his decision to discredit in whole or in part the other medical opinions in the record.

## III.   CONCLUSION

For the foregoing reasons, this case is remanded pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the ALJ should provide non-conclusory, "good reasons" for not assigning controlling weight to Dr. Rudnick's opinion as discussed in section II(C)(2) above (to the extent that remains his conclusion following his further assessment of the record). The ALJ should also more thoroughly evaluate Oomen's subjective complaints of pain as discussed in section II(C)(3)(a). Finally, the ALJ may solicit additional medical evidence to the extent that he believes it would be useful as discussed in section II(C)(3)(b).

The Clerk is directed to close docket entries 13 and 16 and enter judgment remanding this case.

**SO ORDERED.**

Dated: New York, New York
      April 17, 2017

JAMES L. COTT
United States Magistrate Judge